Slip Op. 21– 74

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| MID CONTINENT STEEL & WIRE, INC., | : |
| Plaintiff, | : |
| v. | : Before: Richard K. Eaton, Judge |
| UNITED STATES, | : Consol. Court No. 18-00235 |
| Defendant, | : |
| and | : |
| OMAN FASTENERS, LLC, | : |
| Defendant-Intervenor. | : |

**OPINION**

[U.S. Department of Commerce's final results are sustained.]

Dated: June 14, 2021

*Adam H. Gordon*, The Bristol Group PLLC of Washington, DC, argued for Plaintiff. With him on the brief was *Ping Gong*.

*Sosun Bae*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant. With her on the brief were *Joseph H. Hunt*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director. Of Counsel on the brief was *Ian A. McInerney*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

*Andrew Caridas*, Perkins Coie LLP of Washington, DC, argued for Defendant-Intervenor. With him on the brief were *Michael P. House* and *Shuaiqi Yuan*.

Eaton, Judge: This consolidated case involves a challenge to the final results of the United States Department of Commerce's ("Commerce" or the "Department") second administrative

review of the antidumping duty order on steel nails from the Sultanate of Oman ("Oman"), covering the period of July 1, 2016, through June 30, 2017.[1] *See Certain Steel Nails From the Sultanate of Oman*, 83 Fed. Reg. 58,231 (Dep't Commerce Nov. 19, 2018) ("Final Results"), and accompanying Issues and Decision Mem. (Nov. 9, 2018), P.R. 98 ("Final IDM"). Jurisdiction is found under 28 U.S.C. § 1581(c) (2018) and 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018).

By its motion for judgment on the agency record, Plaintiff Mid Continent Steel & Wire, Inc. ("Plaintiff" or "Mid Continent"), a U.S. producer of steel nails and the petitioner in the underlying proceeding, argues that substantial evidence does not support Commerce's decision to use the financial statement of Amatei Incorporated ("Amatei"), a Japanese nail manufacturer, to construct value for the profit and indirect selling expenses of Oman Fasteners, LLC ("Oman Fasteners"), a mandatory respondent in the review. For Plaintiff, Commerce should have used the financial statement of Astrotech Steels Private Limited ("Astrotech"), an Indian nail manufacturer. *See* Pl.'s Mem. Supp. Mot. J. Agency R., ECF No. 50-1 ("Pl.'s Br."); Pl.'s Reply, ECF No. 57. Plaintiff asks the court to remand the Final Results to Commerce "to reconsider its determination to rely on Amatei's financial statements to calculate [constructed value] profit and selling expenses."[2] Pl.'s Br. 14.

---

[1] *Oman Fasteners, LLC v. United States*, No. 18-00244 is consolidated under the lead case, *Mid Continent Steel & Wire, Inc. v. United States*, No. 18-00235. *See* Order dated Aug. 8, 2019, ECF No. 39; *see also Oman Fasteners, LLC v. United States*, No. 18-00244, 43 CIT __, 2019 WL 3763952 (Aug. 8, 2019) (denying government's motion to dismiss for lack of subject matter jurisdiction).

[2] Plaintiff uses "selling expenses" and "indirect selling expenses" interchangeably in its brief. *Compare, e.g.*, Pl.'s Br. 14 (emphasis added) (asking that the court remand for Commerce "to calculate [constructed value] profit and *selling* expenses"), *with* Pl.'s Br. 1 (emphasis added) ("Commerce's determination to rely on Amatei's financial statements to calculate [constructed value] profit and *indirect selling expenses* was not supported by substantial evidence . . . ."). For purposes of analyzing the sole issue in this case, *i.e.*, whether substantial evidence supports Commerce's choice of financial statement as the source of data to construct value for the

Defendant the United States ("Defendant"), on behalf of Commerce, opposes Mid Continent's motion, and asks the court to sustain the Final Results. *See* Def.'s Opp'n Pls.' Mots. J. Agency R., ECF No. 55 ("Def.'s Br."). For its part, Oman Fasteners—which received a zero percent weighted-average dumping margin—also asks the court to sustain the Final Results.[3] *See* Def.-Int.'s Opp'n Pl.'s Mot. J. Agency R., ECF No. 56.

Because substantial evidence supports Commerce's use of Amatei's financial statement to determine constructed value profit and indirect selling expenses, the court denies Plaintiff's motion and sustains the Final Results.[4]

## BACKGROUND

On July 3, 2017, Commerce published a notice of opportunity to request administrative review of the antidumping duty order on steel nails from Oman. *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Admin.*

---

selling/indirect selling expenses, the direct or indirect nature of selling expenses does not seem to matter, and no party raises it as an issue. The court shall refer to "indirect selling expenses" as that is the term Commerce consistently uses in the Final IDM.

[3]   In this consolidated action, Oman Fasteners intervened on the side of Defendant to ask the court to sustain the Final Results. It is also the Consolidated Plaintiff. *See* Order dated Aug. 8, 2019. As Consolidated Plaintiff, Oman Fasteners has filed a motion for judgment on the agency record that challenges certain of Commerce's findings. *See* Consol. Pl.'s Mem. Supp. Mot. J. Agency R., ECF No. 51-1; Consol. Pl.'s Reply, ECF No. 58. At oral argument, the court clarified, and the parties agreed, that if the court were to remand the Final Results, thus, theoretically placing in jeopardy Oman Fasteners' zero percent margin, it would schedule another oral argument to hear Oman Fasteners' claims. *See* Oral Argument at 18:44, *Mid Continent Steel & Wire, Inc. v. United States*, Consol. Ct. No. 18-00235, https://www.cit.uscourts.gov/audio-recordings-select-public-court-proceedings. If, on the other hand, the court sustained the Final Results, there would be no need to address those claims, as they would be moot. As discussed *infra*, because the court sustains the Final Results, the court denies Oman Fasteners' motion, as moot.

[4]   This is the only issue that remains after the court granted the consent motion of Plaintiff Mid Continent to dismiss Counts I and II of its complaint. *See* Order dated Dec. 19, 2019, ECF No. 45.

*Rev.*, 82 Fed. Reg. 30,833 (Dep't Commerce July 3, 2017). After receiving requests from Mid Continent and Oman Fasteners, Commerce initiated an administrative review covering the period of July 1, 2016, through June 30, 2017. *See Initiation of Antidumping and Countervailing Duty Admin. Revs.*, 82 Fed. Reg. 42,974 (Dep't Commerce Sept. 13, 2017). Oman Fasteners was a mandatory respondent, along with one other company.[5]

Commerce issued to Oman Fasteners an initial antidumping questionnaire and several supplemental questionnaires, asking for, *inter alia*, the company's cost and sales data for the period of review. *See* Commerce's Initial Quest. Oman Fasteners (Sept. 28, 2017), P.R. 10. Oman Fasteners timely responded to these questionnaires. *See* Preliminary Decision Mem. (May 7, 2018), P.R. 81 ("PDM") at 3.

Based on Oman Fasteners' reported sales data, Commerce determined that the company's sales in Oman did not provide a viable basis for calculating the normal value of its merchandise. Rather, Commerce found that the aggregate quantity of Oman Fasteners' sales in its home market during the period of review, or its sales in a third-country market, did not meet the statutory threshold for viability—*i.e.*, five percent of its U.S. sales during the same period. *See* PDM at 11. That is, the aggregate quantity of Oman Fasteners' sales in Oman was below the statutory minimum for Commerce to use the company's actual data to calculate the normal value of its merchandise. *See* 19 U.S.C. § 1677b(a)(1)(B)(ii)(II), (1)(C)(ii). Thus, the Department determined

---

[5] The other mandatory respondent, a collapsed entity comprised of the Overseas International Steel Industry LLC and Overseas Distribution Services Inc., is not a party to this action.

Case 1:18-cv-00235-RKE   Document 65   Filed 06/14/21   Page 5 of 19

Consol. Court No. 18-00235                                                                      Page 5

it would construct a value for normal value, pursuant to 19 U.S.C. § 1677b(e).[6] *See id.* § 1677b(a)(4).

---

[6] The "constructed value of imported merchandise shall be an amount equal to the sum of":

(1) the cost of materials and fabrication or other processing of any kind employed in producing the merchandise, during a period which would ordinarily permit the production of the merchandise in the ordinary course of trade;

(2)(A) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or

(B) if actual data are not available with respect to the amounts described in subparagraph (A), then--

(i) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise,

(ii) the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or

(iii) the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise; and

Constructed value is based on the sum of "the cost of manufacture, selling general and administrative expenses, and profit." 19 C.F.R. § 351.405(a) (2018). For the "cost of manufacture" component of constructed value, Commerce used Oman Fasteners' submitted data. *See* PDM at 12 ("We relied on Oman Fasteners' submitted materials and fabrication costs, G&A, interest expenses, and U.S. packing costs, except in instances where we determined that the information was not valued correctly . . . ."). This is in keeping with the statutory preference to use the producer's actual cost data, where possible, as provided in § 1677b(f).[7] *See* 19 U.S.C. § 1677b(f)(1)(A) ("Costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise.").

For profit and indirect selling expenses, however, Commerce determined it would construct value based on information found in a proxy or surrogate company's financial statement. *See* PDM at 12. Commerce considered nine companies' statements, including those of Astrotech, an Indian producer of steel nails favored by Mid Continent, and Amatei, a Japanese steel nail manufacturer that Commerce ultimately selected as the surrogate company.[8]

When selecting from among the available surrogate companies' financial statements, Commerce applied a judicially approved framework, consisting of four criteria:

---

      (3) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the subject merchandise in condition packed ready for shipment to the United States.

19 U.S.C. § 1677b(e).

   [7]     Commerce's valuation of manufacturing costs is not contested.

   [8]     None of the other companies' financial statements are at issue.

> (1) the similarity between a potential surrogate's business operations and products and the products and operations of the respondent; (2) the extent to which a potential surrogate has sales in the United States and the home market; (3) the contemporaneity of the surrogate data; and (4) the similarity of the customer base between a potential surrogate and the respondent.

PDM at 13; Final IDM at 6; *see also Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 542-43 (Fed. Cir. 2019) (upholding as a reasonable interpretation of the statute Commerce's analysis applying the four criteria framework). These criteria are designed to aid Commerce in selecting surrogate financial statements that will reasonably approximate the exporter's or producer's sales experience *in the home market*. *See Mid Continent*, 941 F.3d at 542 (citing *SKF USA Inc. v. United States*, 263 F.3d 1369, 1373 (Fed. Cir. 2001) for the proposition that "constructed value serves as a proxy for a sales price of the subject merchandise in the home market"); *see also* Statement of Administrative Action,[9] H.R. Doc. 103–316, at 839 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3773, 4175.

With respect to Astrotech, Commerce found that these criteria—especially the second criterion—weighed against using the company's financial statement. It found that "approximately 80 percent of the value of Astrotech's revenue for 2016 [was] from sales of nails to the United States." PDM at 14. Because Astrotech's financial data reflected predominantly U.S. sales, Commerce found that "Astrotech's profit and indirect selling expenses do not reflect the home market . . . sales necessary to construct [normal value]." PDM at 14. In other words, since the objective under § 1677b(e)(2)(B) is to approximate the profit experience of a respondent in the home market, a company whose sales are exclusively or predominantly exports to the United States would not serve as a reasonable proxy. *See, e.g.*, 19 U.S.C. § 1677b(e)(2)(B)(iii) (emphasis added)

---

[9] The Statement of Administrative Action is "an authoritative expression" of legislative intent when interpreting and applying the Uruguay Round Agreements Act. *See* 19 U.S.C. § 3512(d).

("[T]he amount allowed for profit may not exceed the amount *normally realized by exporters or producers* . . . in connection with the sale, for consumption *in the foreign country*, of merchandise that is in the same general category of products as the subject merchandise.").

In contrast to Astrotech's business, Commerce found that "over 90 percent of Amatei's sales are made to its home market of Japan." PDM at 15. Further, based on Amatei's financial statement, Commerce found that the company's

> production and sales are almost exclusively of steel nails. As such, we find that Amatei represents the business operations, production processes, and products most similar to Oman Fasteners. Further, because the vast majority of Amatei's production is nails, we find that its customer base is also most similar to Oman Fasteners.

PDM at 15. Thus, while "acknowledg[ing] that each of these options [*i.e.*, the financial statements of Astrotech and Amatei] has certain limitations," Commerce determined Amatei's financial statement was the best source of data, under the four criteria, to calculate constructed value profit and indirect selling expenses. *See* PDM at 13, 14-15; *see also* Final IDM at 8 ("[F]or the final results, we continue to find that Amatei's [financial statement] is the best source for [constructed value] profit and [indirect selling expenses].").

Commerce thus calculated the constructed value of Oman Fasteners' merchandise, using profit and indirect selling expense data from Amatei's financial statement. Commerce then compared constructed value with the export price of the subject merchandise to determine if Oman Fasteners dumped the subject merchandise (*i.e.*, sold it at less than fair value) during the period of review, and, if so, by what margin. Ultimately, Commerce determined a zero percent weighted-average dumping margin for Oman Fasteners. *See* Final Results, 83 Fed. Reg. at 58,232.

Plaintiff Mid Continent's substantial evidence objections to Commerce's selection of Amatei's financial statement, and its rejection of Astrotech's, are now before the court.

## LEGAL FRAMEWORK

The legal background below is provided for context. There are no legal challenges to Commerce's determinations in the Final IDM, only factual ones.

In an antidumping administrative review, Commerce determines whether dumping has occurred during the period of review by making a comparison between the price at which subject merchandise[10] was sold in the United States (*i.e.*, the export price) and the normal value[11] of the foreign like product[12] sold in the exporting country. *See* 19 U.S.C. § 1677b(a); *see also id.* § 1675(a)(2)(A) (administrative reviews). The antidumping statute provides that Commerce may, under certain circumstances, use a constructed value as a basis for determining normal value, when comparing U.S. and home market prices. *See* 19 U.S.C. § 1677b(a)(1)(B)(ii)(II), (1)(C)(ii), (4). Commerce's regulations provide that it may use a constructed value where, for example, "neither the home market nor a third country market is viable," as Commerce found here.[13] 19 C.F.R. § 351.405(a).

---

[10]     "Subject merchandise" is "the class or kind of merchandise that is within the scope of" an investigation or administrative review. *See* 19 U.S.C. § 1677(25).

[11]     "Normal value" is "the price at which the foreign like product is first sold . . . for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade." 19 U.S.C. § 1677b(a)(1)(A), (B)(i).

[12]     "Foreign like product" is "[t]he subject merchandise and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise." 19 U.S.C. § 1677(16)(A); *see also id.* § 1677(16)(B), (C).

[13]     Other circumstances in which constructed value may be used include where Commerce disregards sales below the cost of production, sales outside the ordinary course of trade (or sales the prices of which are otherwise unrepresentative), or sales used to establish a fictitious market; where no contemporaneous sales of comparable merchandise are available; or in other circumstances where Commerce determines that home market or third-country prices are inappropriate. 19 C.F.R. § 351.405(a).

Section 1677b(e) defines constructed value as the sum of amounts for (1) the cost of manufacture of subject merchandise, (2) selling, general, and administrative expenses, and (3) profit. *See* 19 U.S.C. § 1677b(e)(1), (2)(A)-(B).

With respect to selling, general, and administrative expenses and profit, the statute "identifies four methods for calculating constructed value: one preferred method and three alternative methods among which there is no hierarchy of preference." *Mid Continent*, 941 F.3d at 535 (citing *SKF USA*, 263 F.3d at 1374). The preferred method directs Commerce to look at the company's "actual amounts" of profits, and selling, general, and administrative expenses, "in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in" the company's home market. 19 U.S.C. § 1677b(e)(2)(A). If "actual data are not available with respect to the[se] amounts," however, Commerce may select one of the three alternative methods in § 1677b(e)(2)(B):

> Each of the three alternative methods, like the preferred method, calls for consideration of profits and [selling, general, and administrative expenses]—though each method specifies a different source for that data. The first alternative method focuses on the data associated with the respondent company's other products "in the same general category of products as the subject merchandise." [19 U.S.C.] § 1677b(e)(2)(B)(i). The second focuses on the data of other respondents to the investigation. *Id.* § 1677b(e)(2)(B)(ii). The third allows Commerce to use "any other reasonable method," subject to . . . a "profit cap": the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the [specific respondent at issue]) in connection with the sale, for consumption in [the specific respondent's home market], of merchandise that is in the same general category of products as the subject merchandise. *Id.* § 1677b(e)(2)(B)(iii).

*Mid Continent*, 941 F.3d at 535 (citing *SKF USA*, 263 F.3d at 1372-74).

The third alternative method is the broadest option. "Unlike the first alternative, there is no limitation that data be for the specific exporter or producer, and, unlike the second alternative, there is no limitation that the data relate to foreign like products." *Thai I–Mei Frozen Foods Co.*

Consol. Court No. 18-00235                                                                                                 Page 11

*v. United States*, 616 F.3d 1300, 1308 (Fed. Cir. 2010). "Nevertheless, Commerce's choices must be reasonable ones within the dual constraints of the statute and the record." *Mid Continent*, 941 F.3d at 542.

The aim of the third alternative is to approximate, without exceeding, the amount of profit realized from the sale of subject merchandise in the foreign country "that the respondent can fairly be expected to build into a fair sales price for the particular merchandise." *Mid Continent*, 941 F.3d at 542 (citing *SKF USA*, 263 F.3d at 1373). "[A]ccuracy and fairness must be Commerce's primary objectives." *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1354 (Fed. Cir. 2016) (citations omitted); *see Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013) (citation omitted) ("An overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible."); *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) ("[The] basic purpose of the statute [is to] determin[e] current margins as accurately as possible."). As shall be seen, to select a surrogate company Commerce used four criteria previously found reasonable by the Federal Circuit. *See Mid Continent*, 941 F.3d at 542-43 (concluding that Commerce's application of the four criteria was supported by substantial evidence on the record and noting that the Court saw "no legal error").

**STANDARD OF REVIEW**

The court will sustain a determination by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

This is a substantial evidence case. Plaintiff does not challenge the statutory method Commerce employed to construct profit and indirect selling expenses (*i.e.*, the third alternative, "any other reasonable method," under 19 U.S.C. § 1677b(e)(2)(B)(iii)). Nor does it question the four criteria Commerce considered in making its choice from among the financial statements on the record. Rather, the sole question for the court to decide is a factual one: whether substantial evidence on the record supports the Department's decision to use Amatei's financial statement. Plaintiff argues that Commerce's decision to rely on Amatei's statement lacks such support, and that Astrotech's statement is a better choice. It asks the court to remand this matter so that Commerce may reconsider its selection.

"Substantial evidence is 'such relevant evidence as a reasonable mind might accept to support a conclusion' considering the record as a whole." *Mid Continent*, 941 F.3d at 537 (first quoting *Novartis AG v. Torrent Pharm. Ltd.*, 853 F.3d 1316, 1324 (Fed. Cir. 2017); and then citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487-88 (1951)). Under this standard, "[e]ven if it is possible to draw two inconsistent conclusions from evidence in the record, such a possibility does not prevent Commerce's determination from being supported by substantial evidence." *Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001) (citation omitted). Thus, "[e]ven if [Mid Continent] can identify financial statements that would be reasonable alternatives for Commerce to select, it is not this court's role to identify the most suitable choice." *Shenzhen Xinboda Indus. Co. v. United States*, 45 CIT __, __, 494 F. Supp. 3d 1347, 1355 (2021) (citing *King Supply Co. v. United States*, 674 F.3d 1343, 1348 (Fed. Cir. 2012)) (upholding Commerce's selection of a surrogate financial statement when constructing normal value in a nonmarket economy case).

Based on the record, Commerce's selection of Amatei's financial statement to construct value for profit and indirect selling expenses was reasonable. In the Final Results, Commerce set out the four criteria approved by the *Mid Continent* Court for selecting a surrogate to construct value for profit and selling expense ratios: (1) the similarity between a potential surrogate's business operations and products and the products and operations of the respondent; (2) the extent to which a potential surrogate has sales in the United States and the home market; (3) the contemporaneity of the surrogate data; and (4) the similarity of the customer base between a potential surrogate and the respondent. *See Mid Continent*, 941 F.3d at 542-43; *see also* Final IDM at 6.

Taking each criterion in turn, Commerce first found that Amatei's business operations and products were most similar to Oman Fasteners', for "[a]s explained in the *Preliminary Results* and as demonstrated by record evidence, Amatei predominantly produces and sells steel nails." Final IDM at 5. Commerce observed that, according to Amatei's 2017 financial statement, Amatei's nails sales comprised eighty percent of the company's total sales. *See* Final IDM at 6. Though its subsidiary sold screws, the statement distinguished parent and subsidiary sales, which made it possible to calculate a constructed value based solely on the company's sales of nails:

> Amatei's [financial statement] separates sales for Amatei, which is focused on steel nail production and sales, and Amatei's subsidiary, Natec Co., Inc., (Natec), which is focused on producing and selling screws. Amatei's 2017 [financial statement] separately provides net sales value for both Amatei and Natec, with *Amatei's sales comprising over 80% of the total sales of both companies*. Hence, *Commerce was able to calculate a [constructed value] profit amount based on sales of steel nails exclusive of the other products* that Natec produced. Amatei's 2017 [financial statement] also reports "improved operating income as a result of decreased manufacturing costs, increased productivity, low material costs and mass production of domestic products." Amatei reports its most significant fixed asset is "machine and devices" that are used in manufacturing operations, and the company lists work-in-progress, finished goods inventory and salaries associated with this production. Further, Amatei's 2017 [financial statement] make[s] clear that *its main business is "manufacturing, purchasing, and selling ordinary nails, specialty*

> nails . . ." *and that its main raw material is wire*. All of this demonstrates that
> Amatei is focused on steel nails production and sales.

Final IDM at 6 (emphasis added); *see also* PDM at 15 (finding that, because Amatei's "production and sales are almost exclusively of steel nails," Amatei "represents the business operations, production processes, and products most similar to Oman Fasteners."). Thus, the first criterion weighed in favor of using Amatei's financial statement.

As to the second criterion, "the extent to which a potential surrogate has sales in the United States and the home market," Commerce found that "over 90 percent of Amatei's sales are made to its home market of Japan." PDM at 15. In contrast, Commerce noted, approximately eighty percent of the value of Astrotech's revenue for 2016 was from sales of nails to the United States, according to third-party export data on the record. *See* PDM at 14. Commerce found the second criterion to weigh in favor of Amatei because, with most of its sales being made to its home market, its data better approximated the home market profit experience of Oman Fasteners.

The third criterion, the contemporaneity of the surrogate data, weighed equally as between Amatei and Astrotech. Both companies' audited financial statements for fiscal year 2016 overlapped with the period of review—July 1, 2016, through June 30, 2017. *See* PDM at 12-13.

Finally, as to the fourth criterion—"the similarity of the customer base between a potential surrogate and the respondent"—the similarity of Amatei's and Oman Fasteners' businesses, in terms of nail production, weighed in favor of choosing Amatei as the proxy. Commerce found that "because the vast majority of Amatei's production is nails, we find that its customer base is also most similar to Oman Fasteners." PDM at 15.

Having determined that Amatei's financial statement was "the best source" for constructed value profit, Commerce further found that it was the best source for indirect selling expenses. *See* Final IDM at 8 ("For the above reasons, for the final results, we continue to find that Amatei's

[financial statement] is the best source for [constructed value] profit and [indirect selling expenses]."); *see also* PDM at 16 ("[W]ith respect to indirect selling expenses, because Oman Fasteners does not have a viable home market or third-country market, Commerce does not have comparison market selling expenses to use in its calculations, as directed by [19 U.S.C. § 1677b(e)]. As an alternative, to calculate selling expenses, for the preliminary results, Commerce has used the same financial statement that it used to calculate [constructed value] profit (*i.e.*, Amatei's), in accordance with [19 U.S.C. § 1677b(e)(2)(B)(iii)].").

Plaintiff argues that the record does not support Commerce's choice of Amatei's financial statement but rather supports the use of Astrotech's financial statement. For Mid Continent:

> Commerce's determination to rely on Amatei's financial statements to calculate [constructed value] profit and indirect selling expenses was not supported by substantial evidence, because the record evidence shows that Amatei is not *a pure producer* of steel nails. Rather, it also produces and sells screws, building materials, nailing machines, and provides testing services. More importantly, more than half of the steel nails sold by Amatei are produced for it by foreign [original equipment manufacturer] producers – in other words, Amatei resells more nails produced by foreign suppliers than it sells of its own manufactured nails.

Pl.'s Br. 1 (emphasis added). To support its argument, Plaintiff points to language in Oman Fasteners' statement concerning the company's "mid-to-long-term management strategy" stating: "[O]ver the past few years, the company has . . . sold larger volumes of [original equipment manufacturer] nails than of nails it produces itself domestically." Pl.'s Br. 8 (record citations omitted). Based on this increase in resales, Plaintiff argues that instead of Amatei's financial statement, Commerce should have used Astrotech's:

> In contrast [to Amatei's financial statement], [Astrotech] is predominantly a producer of steel nails, and more importantly, like Oman Fasteners LLC and unlike Amatei, it sells self-produced nails. In addition, Astrotech sells nails to many countries in addition to the United States, such as South Korea, Sri Lanka, Europe, and Australia. Therefore, Astrotech's financial statements are the best source for calculating [constructed value] profit and indirect selling expenses.

Pl.'s Br. 2. Thus, for Plaintiff, Astrotech's financial statement was the best source of constructed value data.

Plaintiff's arguments against Commerce's choice of financial statement are unconvincing because Mid Continent "has not identified any evidence that undermines the reasonableness of Commerce's choice." *Shenzhen*, 494 F. Supp. 3d at 1355. First, in the Final Results, Commerce acknowledged, as Plaintiff points out, that Amatei is not a "pure producer" of steel nails. It recognized that Amatei's subsidiary produced screws. Commerce found, however, that Amatei's nails sales comprised the majority of the total sales of both companies, and that the company's financial statement adequately distinguished between nail and screw sales, so that it was possible to construct profit based exclusively on sales of nails. *See* Final IDM at 6 (emphasis added) ("Amatei's 2017 [financial statement] separately provides net sales value for both Amatei and Natec, with *Amatei's sales comprising over 80% of the total sales of both companies*. Hence, *Commerce was able to calculate a [constructed value] profit amount based on sales of steel nails exclusive of the other products* that Natec produced.").

Next, Mid Continent's argument that Amatei is not the best proxy because of its resale of original equipment manufacturer nails does not persuade the court that Commerce's choice was unreasonable. Plaintiff characterizes Oman Fasteners' resales of original equipment manufacturer nails as a "disqualifying circumstance," which makes the company a *de facto* unreasonable choice for proxy. *See* Pl.'s Br. 7-8. For Mid Continent, Oman Fasteners' resale activities make it more of a nail distributor than a nail producer. *See* Pl.'s Br. 9. As Commerce noted in the Final Results, however, Mid Continent "does not claim that Amatei is *only* a reseller of steel nails or that it sells its own nails *in such small quantities* as to render Amatei's 2017 [financial statement] unreliable." Final IDM at 8 (emphasis added). Indeed, the Department points to representations in Amatei's

financial statement that it realized increased profits due to a "drop in manufacturing cost unit price and reduced manufacturing costs thanks to stable materials prices and productivity improvements." Final IDM at 7-8 (citation to record omitted). For Commerce, Amatei's statements "demonstrate[] that while resales of steel nails are a part of Amatei's selling experience, sales of steel nails that it manufactur[es] itself also [a]ffect Amatei's net sales." Final IDM at 8.

Plaintiff has pointed out a potential limitation in the financial statement, but it does not undermine the reasonableness of Commerce's choice, for none of the available financial statements were without their own flaws—including Astrotech's financial statement. In the Final Results, Commerce stated its reasons for finding that Astrotech's financial statement was not the "best" source on the record for constructed value:

> Astrotech predominantly sells to the United States. As such, Astrotech's 2017 [financial statement is] unsuitable in the calculation of a normal value based on [constructed value]. Because Commerce seeks to compare U.S. sales to normal value from the home or a third-country market, we have stated that we do not want to construct a normal value based on financial data that contain exclusively or predominantly U.S. sales. Further, in accordance with [19 U.S.C. § 1677b(e)(2)(B)], generally, we seek a home market profit experience to the extent possible. With regard to the petitioner's claims that Astrotech made sales to markets other than the United States, we do not dispute this argument. However, while Astrotech may make sales to markets other than the United States, record evidence demonstrates that the majority of Astrotech's sales are to the United States. Further, apart from questions about [certain third-party data], the petitioner does not refute Commerce's finding in the *Preliminary [Results]* that Astrotech sold a majority of its steel nails to the United States, only that Astrotech sells to a "diversified customer base" (other than the United States). Selling to a diverse customer base does not equate to finding that Astrotech sold less than the majority of its steel nails to the United States, as determined at the *Preliminary Results*.

Final IDM at 6-7. Thus, Astrotech did not have home market sales sufficient to satisfy the statutory direction to approximate, without exceeding, "the amount normally realized by exporters or producers . . . in connection with the sale, for consumption *in the foreign country*, of merchandise

that is in the same general category of products as the subject merchandise." 19 U.S.C. § 1677b(e)(2)(B)(iii) (emphasis added).

As Commerce acknowledged, "each of the[ financial statement] options has certain limitations." PDM at 13. Mid Continent, however, has not shown a lack of substantial evidence for the factual determinations under the four criteria that the Department considered in its analysis. *See Mid Continent*, 941 F.3d at 542-43. Rather, it maintains that Astrotech's financial statement would have been a better choice, inviting the court to reweigh the evidence. This the court may not do. *See Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1376-77 (Fed. Cir. 2015). Because the record supports Commerce's determination that Amatei's financial statement was a reasonable proxy to calculate constructed value profit and indirect selling expenses, it is sustained.

Finally, the court's decision to sustain the Final Results renders moot the motion for judgment on the agency record that Oman Fasteners filed in its capacity as Consolidated Plaintiff. As agreed at oral argument, Defendant-Intervenor Oman Fasteners asks the court to sustain the Final Results, and would seek to be heard on its motion (as Consolidated Plaintiff) only in the event the court remanded the Final Results (thus, potentially placing in jeopardy Oman Fasteners' zero percent margin). *See* Oral Argument at 18:44, *Mid Continent Steel & Wire, Inc. v. United States*, Consol. Ct. No. 18-00235, https://www.cit.uscourts.gov/audio-recordings-select-public-court-proceedings. Thus, because the court sustains the Final Results, Oman Fasteners' motion is denied as moot.

## CONCLUSION

Based on the foregoing, the Final Results are sustained. Mid Continent's motion for judgment on the agency record is denied, as is Oman Fasteners' motion for judgment on the agency record. Judgment shall be entered accordingly.

          /s/ Richard K. Eaton
Richard K. Eaton, Judge

Dated: June 14, 2021
       New York, New York